**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0709-21

BOARD OF EDUCATION OF THE
TOWNSHIP OF LAKEWOOD,
OCEAN COUNTY,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT OF
EDUCATION and KATHLEEN
EHLING,

     Respondents-Respondents.

_____

Argued October 17, 2023 – Decided November 27, 2023

Before Judges Whipple, Enright and Paganelli.

On appeal from the New Jersey Commissioner of Education, Docket No. 152-7/20.

Edward J. Dauber and Michael I. Inzelbuch argued the cause for appellant (Greenberg Dauber Epstein & Tucker, PC and Michael I. Inzelbuch, attorneys; Edward J. Dauber, Michael I. Inzelbuch and Michael Harris Freeman, on the briefs).

Matthew J. Lynch, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Donna Sue Arons, Assistant Attorney General, of counsel; Michael Czarnecki and Christopher W. Weber, Deputy Attorneys General, on the brief).

PER CURIAM

In this appeal we are presented with a narrow question of whether a final agency decision (FAD) of the Commissioner of Education was arbitrary and capricious because it was based upon an improper method of calculation. We affirm.

Federal funds are provided to school districts to supplement special education services pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 to 1482. The federal regulations require states to monitor school districts and determine whether there is "significant disproportionality" with respect to the racial composition of students in specific areas of special education. States are charged with determining the calculations that constitute disproportionality. If a district has disproportionality for three consecutive years in one area, it must use 15% of its IDEA grant for Comprehensive Coordinate Early Intervening Services (CCEIS) to determine the root causes of the disproportionality and to address those causes.

In April 2020, the New Jersey Department of Education (DOE or Department) informed the Lakewood Board of Education (BOE or the Board) that Lakewood Public School District (Lakewood or District) had significant disproportionality for three consecutive years in five areas of special education. In those five categories, Lakewood's risk ratios exceeded the State's threshold of 3.0.  District White students were disproportionally identified in four categories, and Black students were disproportionately represented in total disciplinary removals.  As a result, DOE instructed Lakewood to use 15% of its IDEA funding to address the disproportionality.

The Board appealed the disproportionality determination, but the DOE commissioner affirmed it, issuing an FAD.  BOE now appeals here, arguing the decision was arbitrary and capricious because it was based upon factual errors and an improper methodology of calculation.

I.

Under Part B of the IDEA, 20 U.S.C. §§ 1400 to 1482, states receive grants which they must allocate to local educational agencies (LEAs)[1] with the goal of ensuring the provision of a "free and appropriate public education" for students with disabilities.  In order for LEAs to receive federal assistance, the

---

[1] We use the terms "LEA" and "school district" interchangeably.

IDEA requires states to determine whether "significant disproportionality based on race and ethnicity" is present within (1) the identification of children as children with disabilities; (2) the placement in particular educational settings of such children; and (3) disciplinary actions against those students in any LEA within a state. 20 U.S.C. § 1418(d); 34 C.F.R. §§ 300.646 & 300.647. Under the IDEA, state departments of education must calculate risk ratios and determine whether districts are significantly disproportionate. Ibid. If a state finds any significant disproportionality in an LEA, it must require the LEA to reserve "the maximum amount of funds [defined elsewhere in the statute] . . . to provide [CCEIS] to serve children" in the LEA. 20 U.S.C. § 1418(d)(2).

"Disproportionality" occurs when more individuals from a particular group are experiencing a given situation than one would expect based on that group's representation in the general population. See 20 U.S.C. § 1418(d); 34 C.F.R. §§ 300.646 & 300.647. Disproportionality is considered "significant" when overrepresentation of a group exceeds a specific risk ratio threshold, set by each individual state. 34 C.F.R. §§ 300.647(a)(7) and (b)(1)(ii). A "risk ratio" is the measure of a specific racial or ethnic group's risk, as compared to all other children, of special education identification or placement or of discipline of special education students. 34 C.F.R. §§ 300.647(a)(5) and (6). A

A-0709-21

risk ratio for each category is calculated by determining the risk that a group of children in the LEA will receive the particular treatment (e.g., identification, placement, or discipline) and comparing that risk with the risk faced by other comparable children in the district.

For instance, to determine whether there is significant disproportionality for Black children receiving a particular special education identification, the state would calculate the risk for Black children by dividing the number of Black children receiving that identification by all Black children in the LEA. See 34 C.F.R. §§ 300.647(a)(5). Then, the risk of all other children in the LEA receiving that identification is calculated by dividing the number of non-Black children in that category by the total number of non-Black children in the district. See 34 C.F.R. §§ 300.647(a)(5) and (6). Finally, the risk for Black children is then divided by the risk for all other children, resulting in the risk ratio for Black children in that category. See ibid.

States have an obligation to collect and examine data and determine whether there is significant disproportionality based on race or ethnicity in the LEAs. 20 U.S.C. § 1418(d); 34 C.F.R. § 300.646. There are fourteen categories for which states must calculate risk ratios. 34 C.F.R. §§ 300.647(b)(3) and (4). With regard to determining which particular data to use, the regulations

A-0709-21

specifically state that data pertaining to children "enrolled in an LEA" or "within an LEA" are to be used in conducting these calculations. 34 C.F.R. §§ 300.647 (a)(1), (2), (4), (5), and (6).

If an LEA is determined to have significant disproportionality in any one of the enumerated areas for three consecutive years, it must set aside 15% of its IDEA Part B funds for the implementation of CCEIS. 20 U.S.C. § 1418(d)(2)(b); 34 C.F.R. § 300.646(d). There is no provision that would allow a particular state to waive the statutory remedy for an LEA identified with significant disproportionality. See ibid.

## II.

In December 2016, the United States Department of Education (USDOE) issued new regulations changing the way each state would identify districts with significant disproportionality. 81 Fed. Reg. 92376, 92378 (Dec. 19, 2016). The 2016 regulations required states to use risk ratios to analyze disparities across racial and ethnic groups, while providing each state with the discretion to determine the appropriate risk ratio threshold that would be used to determine significant disproportionality. 81 Fed. Reg. 10968, 10981 (Mar. 2, 2016); 34 C.F.R. § 647(a)(6).

A-0709-21

Following litigation in federal court over a proposed delay in the implementation of the regulations, Council of Parent Attys. & Advocates, Inc. v. DeVos, 365 F. Supp. 3d 28 (D.D.C. 2019), the 2016 regulations took effect on March 17, 2019. Due to the timing of the decision, which was close to the time in which the DOE conducted its risk ratio calculations, DOE used a hybrid model for identifying districts with significant disproportionality for the 2019-2020 grant year. In this hybrid model, significant disproportionality was identified only in school districts that had both (1) met the risk ratio threshold, and (2) had been previously identified for significant disproportionality. This hybrid model allowed both DOE and the LEAs to prepare for the changes that would be implemented. For the following grant year, 2020-2021, DOE implemented the risk ratio model as set forth in the 2016 Regulations and implemented by the court in DeVos. Therefore, the first time DOE fully used the 2016 regulations, which were intended to more accurately determine areas of significant disproportionality, was in the spring of 2020 for the upcoming 2020-2021 grant year.

States select their own risk ratio thresholds for determining significant disproportionality so long as they are reasonable and are developed based on input from stakeholder districts. 34 C.F.R. § 300.647(b). Accordingly, in

7

preparation for the implementation of the 2016 regulations, DOE held meetings with stakeholders on May 18 and October 19, 2017, to discuss the calculations of significant disproportionality conducted in the spring that would apply to the following grant year—e.g., a calculation done in the spring of 2020 would be applicable to the 2020-2021 grant year. At both meetings, participants discussed the updates to the calculation of significant disproportionality. They were also afforded the opportunity to give recommendations for New Jersey's risk ratio threshold and for handling districts identified with significant disproportionality. DOE also worked collaboratively with federal technical assistance centers such as the IDEA Data Center, the National Center for Systemic Improvement, and the Center for IDEA Fiscal Reporting to ensure the best and most appropriate risk ratio threshold would be used. At the culmination of these efforts, DOE determined its appropriate risk ratio threshold would be 3.0, its minimum cell size would be ten,[2] and a minimum n-size of 30[3] would be

---

[2] A minimum cell size is the "minimum number of children experiencing a particular outcome, to be used as the numerator" when calculating risks. 34 C.F.R. § 300.647(a)(3).

[3] A minimum n-size is the "minimum number of children enrolled in an LEA with respect to identification, and the minimum number of children with disabilities enrolled in an LEA with respect to placement and discipline, to be used as the denominator" when calculating risks. 34 C.F.R. § 300.647(a)(4).

chosen. These numbers are presumptively reasonable under federal regulations. 34 C.F.R. § 300.647(b)(1)(iv)(A) and (B).

III.

In New Jersey, the data used to calculate an LEA's risk ratio is collected through two web-based systems: NJ SMART Reporting, and Student Safety Data System (SSDS). Both systems are maintained by DOE, but the actual information on the systems comes directly from the LEAs. Based on the data provided by Lakewood through NJ SMART and SSDS, DOE determined some of Lakewood's risk ratios for special education identification and placements were significantly disproportionate in 2020. That meant, for the previous three years, Lakewood's risk ratios exceeded the State threshold in four categories: White students with autism, White students with intellectual disability, White students with all eligibilities, and White students placed in separate education settings.

In other words, the number of White students within each respective category, as compared to the total number of White students in the district overall,[4] was significantly disproportionate to the number of all other students

---

[4] In placement categories, such as students placed in separate education settings, the number of White students within each respective category is compared to the total number of White students with disabilities in the district overall.

within each respective category, meaning the risk ratio in each category exceeded the state threshold of 3.0. That is, for example, White children were at least three times more likely to be identified as having autism than were non-White children in the district. Consistent with the IDEA, DOE completed its calculations using the student population enrolled in the district's public schools but did not include those students enrolled in non-public schools.

DOE also calculated risk ratios for disciplinary removals, which it must do for children with disabilities ages six through twenty-one. 34 C.F.R. § 300.647(b)(4)(ii). To determine if an LEA is significantly disproportionate for disciplinary removals, DOE reviews five categories, all of which can have their own finding of significant disproportionality: "out-of-school suspensions and expulsions of [ten] days or fewer"; "out-of-school suspensions and expulsions of more than [ten] days"; "in-school suspensions of [ten] days or fewer"; "in-school suspensions of more than [ten] days"; and "disciplinary removals in total." 34 C.F.R. § 300.647(b)(4)(iii)–(vii). The first four disciplinary risk ratios are calculated using the number of students who faced those disciplinary actions. The fifth, however, is calculated based on the total disciplinary removals, as the category's name suggests. Lakewood's data indicated that a

10

significantly disproportionate number of total disciplinary removals occurred among Black special education students.

Consistent with the IDEA, DOE reached its calculations regarding significant disproportionality as to disciplinary removals using the student population enrolled in its public schools but did not include those students enrolled in non-public schools. See 34 C.F.R. § 300.647(b).

Lakewood has a demographic situation unique in the State and possibly in the nation, inasmuch as the non-public school population is six times that of the public school population. Nationally, and in the rest of New Jersey, the percentage of students enrolled in non-public schools is 11% or 12%, but in Lakewood it is 88%.[5]

On April 6, 2020, DOE notified BOE the DOE had calculated the District's risk ratios and found that it was significantly disproportionate in five categories. As such, Lakewood would be required to allocate 15% of its 2020-2021 IDEA

---

[5] The National and New Jersey figures are taken from New Jersey Education Data, TownCharts, https://www.towncharts.com/New-Jersey/New-Jersey-state-Education-data.html (last visited Nov. 15, 2023) (based on data collected via the American Community Survey, administered by the U.S. Census Bureau). The Lakewood figure is obtained by dividing the number of nonpublic students in the district (39,513) by the total number of students in the district (44,978).

Part B funding for CCEIS to identify and address the underlying causes of the disproportionality.

In response, BOE provided a June 1, 2020 expert report from Sue Gamm, Esq., disputing the Department's calculations. Notably, Gamm included non-public students in her analysis of special education placements. As to disciplinary removals, Gamm agreed non-public students could not be included due to a lack of data and acknowledged there was significant disproportionality for total disciplinary removals of Black students in the district.

On June 24, 2020, in response to Lakewood's inquiry, DOE provided BOE with the raw data used to calculate Lakewood's disciplinary removal findings.

On July 1, 2020, Lakewood petitioned DOE's Office of Controversies and Disputes, naming as respondents DOE and Kathleen Ehling, its Director of the Office of Fiscal and Data Services. Lakewood challenged the DOE's significant disproportionality determination, and argued the DOE's findings should have included non-public students. Its three-count petition alleged violations of substantive and procedural due process, and "the [c]ivil [r]ights of [p]ublic [s]chool [s]tudents." The matter was transferred to the Office of Administrative Law as a contested case, and—at the conclusion of discovery—both parties filed motions for summary decision, which included a joint stipulation of facts.

12

In his July 20, 2021 decision granting DOE's motion, the Administrative Law Judge (ALJ) found Lakewood crossed the 3.0 risk ratio threshold and was significantly disproportionate in the following categories: White-autism, 6.85; White-intellectual disability, 13.87; White-all eligibilities, 3.35; White-separate settings, 14.38; and Black-total disciplinary removals, 8.42. The ALJ also found there was no factual dispute about the mathematical calculations. The ALJ found Lakewood was provided the raw data used to calculate the disciplinary removal findings on June 24, 2020. The ALJ concluded DOE had complied with the regulations and requirements of the IDEA as written and was not required to include non-public students in their calculations. The ALJ noted the dispute did not pertain to the accuracy of the data, but rather "whether students placed in private schools should be considered in computing the ratio to determine disproportionality." The ALJ determined DOE's decision to exclude non-public students in the computation of the risk ratio was not arbitrary or capricious, noting there was no requirement that a state consider such students in their calculations. Although Lakewood contended the reason for disproportionality is the large number of students residing in Lakewood that attend non-public schools, the ALJ concluded "[u]ncovering the factor(s) causing the discrepancy is the purpose of the CCEIS fund allocation."

A-0709-21

The ALJ also rejected Lakewood's procedural due process claim, noting there is no requirement for early notification a district might be identified as being significantly disproportionate. But, DOE did advise Lakewood in October 2018 of the change in risk ratio thresholds and that Lakewood was at risk of exceeding them.

As the ALJ observed, "[t]hat Lakewood chose not to follow up with the State or to look at the data it was submitting annually to the State and perform its own calculations does not mean that the State failed to provide adequate notice to the LEA." He further found Lakewood was not entitled to attend any stakeholder meetings, because there is no requirement to invite Lakewood, or any other specific district.

The ALJ granted DOE's motion for summary decision and held Lakewood was required to use 15% of its total IDEA Part B funds for CCEIS ($1,442,938).

On October 18, 2021, the Commissioner issued her decision agreeing with the ALJ, granting DOE's motion for summary decision, and dismissing Lakewood's petition. She agreed with the ALJ that the Department's decision to set the risk ratio at 3.0, and to apply a uniform methodology without making an exception for Lakewood's specific circumstances, was not arbitrary, capricious, or unreasonable and so did not violate substantive due process. The

A-0709-21

Commissioner explained DOE "was not obligated to deviate from its chosen calculation methodology to address Lakewood's private school population[,]" and that DOE "complied with the federal regulations and requirements of the IDEA as they are written."  She further noted Lakewood failed to cite any provision within the federal regulations that would require the Department to include private school students in its calculations.  On the other hand, she explained, 34 C.F.R. § 300.647 "repeatedly refers to students 'enrolled in the LEA' or 'within the LEA,' supporting the [DOE's] decision to include only public school students in the disproportionality calculations." (footnote omitted).

The Commissioner also rejected Lakewood's argument that the "root cause for Lakewood's disproportionality is that many White parents in Lakewood send their White children to private schools."  She reasoned, "while the [DOE] is aware of those demographic circumstances, it does not necessarily follow that the demographics are the root cause of disproportionality among Lakewood's public school students."  She explained "[t]he purpose of calculating significant disproportionality and setting aside CCEIS funds is to identify and address contributing factors, 34 C.F.R. § 300.646," and thus she disagreed that "an assumption based on Lakewood's demographics sufficiently analyzes or addresses possible causes."  The Commissioner also rejected Lakewood's

15

procedural due process claims, finding there is "no dispute that the DOE issued a notice to the Board when it was found to be significantly disproportionate." The Commissioner pointed out there were at least two occasions when DOE "notified Lakewood that it was trending towards disproportionality[,]" as well as the fact Lakewood clearly had an opportunity to be heard, given that it was engaged in an administrative proceeding. She also held there was no requirement that specific districts attend stakeholder meetings, and Lakewood was, therefore, not entitled to attend those meetings.

The Commissioner agreed with the ALJ that Lakewood was required "to set aside $1,442,938—15% of its total IDEA grant funds—for CCEIS programs at Lakewood's public schools." The Commissioner also emphasized she did not have any discretion regarding the 15% reservation of IDEA Part B funds, explaining that, under 20 U.S.C. § 1418(d)(2), "a state shall require the district to reserve the maximum amount of funds to provide CCEIS[.]" (emphasis in original). And given that 20 U.S.C. § 1413(f)(1) sets the maximum amount of funds at 15%, she concluded those "provisions do not afford the Commissioner any discretion to reduce the amount of CCEIS funds that [Lakewood] is required to set aside." Finally, the Commissioner also denied Lakewood's motion to supplement the record under N.J.A.C. 1:1-18.4(c), holding there is no provision

under the Uniform Administrative Procedure Rules or N.J.A.C. 6A:3 that permitted for the supplementation of the record before her. She noted under N.J.A.C. 1:1-18.4(c), "[e]vidence not presented at the hearing shall not be submitted as part of an exception, nor shall it be incorporated or referred to within exceptions." This appeal followed.[6]

## IV.

Our review of an agency decision is limited. Circus Liquors, Inc. v. Middletown Twp., 199 N.J. 1, 9 (2009). Our review is focused on: (1) whether the agency followed the law; (2) whether the agency's decision is supported by substantial evidence in the record; and (3) whether in applying the law to the facts, the agency reached a supportable conclusion. See City of Jersey City v. Jersey City Police Officers Benev. Ass'n, 154 N.J. 555, 567 (1998). Absent a "clear showing" that the agency's decision is "arbitrary, capricious, or unreasonable, or that it lacks fair support in the record," an agency's final decision should be upheld, "regardless of whether a reviewing court would have

---

[6] On March 10, 2022, we granted Lakewood's motion to supplement the record with materials outside the record before the Commissioner—including, but not limited to, training materials the Department produced, Lakewood's contracts and proposals for CCEIS, and emails and attached documents between the Department and Lakewood's agents—but noted in our order the Department may argue that the materials should not be factored into considering the merits of the appeal.

reached a different conclusion in the first instance." Circus Liquors, 199 N.J. at 9. "If the agency decision satisfies these criteria, [the court is] bound to give substantial deference to the agency's fact-finding and legal conclusions, while acknowledging the agency's 'expertise and superior knowledge of a particular field.'" Twp. Pharmacy v. Div. of Med. Assistance & Health Servs., 432 N.J. Super. 273, 284 (App. Div. 2013) (quoting Circus Liquors, 199 N.J. at 10).

A strong presumption of reasonableness is accorded to agency decisions, and the court should not substitute its "judgment for the wisdom of agency action if that action is statutorily authorized and not arbitrary or unreasonable." Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood, 257 N.J. Super. 413, 455 (App. Div. 1992). As long as the agency decision is contemplated under its enabling legislation, the "action must be accorded a presumption of validity and regularity." Ibid. And where, as in this case, "special expertise is required, . . . an even stronger presumption of reasonableness exists." Ibid. Thus, while we examine legal questions de novo, we are "mindful of an administrative agency's day-to-day role in interpreting statutes 'within its implementing and enforcing responsibility.'" In re State Bd. of Educ.'s Denial of Petition to Adopt Regulations Implementing N.J. High Sch. Voter Registration Law, 422 N.J.

Super. 521, 530-31 (App. Div. 2011) (quoting Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001)).

States must comply with federal law in fulfilling their obligations under the IDEA. Here, DOE considered only those students enrolled in the districts' public schools in its methodology for determining whether public school districts are disproportionately subjecting certain subgroups of special education students to different treatment. The IDEA defines a "local educational agency" as

> a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.
>
> [34 C.F.R. § 303.23(a) (emphasis added).]

States are required to determine risk, defined as "the likelihood of a particular outcome (identification, placement, or disciplinary removal) for a specified racial or ethnic group (or groups)." 34 C.F.R. § 300.647(a)(5). That is calculated "by dividing the number of children from a specified racial or ethnic group (or groups) experiencing that outcome by the total number of

children from that racial or ethnic group or groups <u>enrolled in the LEA</u>." <u>Ibid.</u> (emphasis added). The "risk ratio," in turn, is calculated by "dividing the risk of a particular outcome for children in one racial or ethnic group <u>within an LEA</u> by the risk for children in all other racial and ethnic groups <u>within the LEA</u>." 34 C.F.R. § 300.647(a)(6) (emphases added). Based on this language, New Jersey established a formula for calculating risk that divided the number of children of a specified racial or ethnic group in the LEA experiencing a particular outcome by the total number of children from that racial or ethnic group enrolled in the LEA. <u>See</u> 34 C.F.R. §300.647(a)(5). This approach follows the plain letter of the regulation, because the purpose of the disproportionality calculation is to identify where districts are treating certain public-school students differently based on their characteristics. <u>See</u> 34 C.F.R. § 300.646(a) (requiring states receiving IDEA Part B funds "to determine if significant disproportionality based on race and ethnicity is occurring in the . . . LEAs of the State").

Significantly, public school districts do not determine the special education placements for students parentally placed in private schools. In our view, it is consistent with the IDEA for the DOE to calculate risk ratios based solely on children enrolled in the LEA and excluding non-public students. Thus, when DOE calculated Lakewood's risk ratios without considering its parent-

chosen, private school students, DOE properly found there was significant disproportionality in Lakewood because the district exceeded the risk ratio threshold of 3.0 in four special education identification or placement categories. In doing so, DOE followed the law and properly calculated those risk ratios using data from students enrolled in the LEA—while excluding from its calculations consideration of students enrolled by their parents in private, non-public schools. The USDOE has stated districts were not required to include non-public students in disproportionality calculations.[7] The commissioner agreed, finding "no such requirement in the applicable law[,]" and that 34 C.F.R. § 300.647 "repeatedly refers to students 'enrolled in the LEA' or 'within the LEA,' supporting the [DOE's] decision to include only public school students in the disproportionality calculations."

Districts have little to no control over special education placement determinations by private schools and we do not consider it unreasonable for states to exclude those non-public school students from the disproportionality calculation. Although Lakewood has certain duties and responsibilities under

---

[7] Memorandum from William W. Knudsen, Acting Director, Office of Special Education Programs, USDOE to Chief State School Officers and State Directors of Special Education. 9 ¶14 (July 28, 2008) (https://www2.ed.gov/policy/speced/guid/idea/ceis-guidance.pdf).

the IDEA to provide services to non-public school students attending private schools located in Lakewood, those services are not the same as the identification and placement actions at issue in the disproportionality review. Lakewood is correct it must provide "child find," consultation, and other services to private school students, but this has no bearing on whether the district engages in significant disproportionality with respect to students enrolled in the LEA. Under the IDEA, children who are parentally placed in private schools do not have an individual entitlement to the special education and related services they would receive if they were enrolled in public schools. The IDEA requires the LEA to engage in timely and meaningful consultation to determine which parentally placed children with disabilities will be designated to receive special education and related services. But it is possible and permissible under the IDEA that some of these parentally placed children with disabilities will not receive any special education and related services.

Lakewood argues the only root cause for its disproportionality is its demographics and it is pointless to require Lakewood to use IDEA funds to examine that further. We have previously recognized the demographic peculiarities present in Lakewood, Alcantara v. Allen-McMillan, 475 N.J. Super. 58 (App. Div. 2023), but it does not necessarily follow that the

demographics are the root cause of the disproportionality among Lakewood's public-school students. Although demographics may be a contributing factor, without further investigation, we conclude it would be arbitrary and capricious to presume it is the only factor.

We are not persuaded the DOE's decision to perform Lakewood's disproportionality calculations based only on the students enrolled in public schools was arbitrary, capricious, or unreasonable. Lakewood argues the Department's calculations of disproportionality were "skewed, unrepresentative, and unreliable" only "because the public school and non[-]public school populations are markedly different" than other districts. Utilizing the Gamm report, the Board asserts that, had DOE considered all students residing in Lakewood, there would have been no instances of significant disproportionality involving White students. This may be true, in as far as it goes. Lakewood's focus on its White student population, however, is itself skewed, unrepresentative, and unreliable, because, had DOE factored in all students residing in Lakewood—as Lakewood advocates—there would almost certainly have been even more instances of significant disproportionality—only these would have been reflected in Black and Hispanic populations. Disproportionality is not eliminated by simply increasing the quantity of

individuals in a population. Disproportionality can only be eliminated by stabilizing the proportions among the separate populations being examined, because Lakewood's student population is significantly disproportionate.

V.

We reject Lakewood's argument that it should be permitted to divert only 15% of the portion of the IDEA grant allocated to public school students, rather than being required to divert 15% of its total IDEA grant. The relevant regulations and statutes do not allow the remedy Lakewood advocates.

Federal law requires any LEA that is identified by a state as significantly disproportionate must reserve the maximum amount of funds required under 20 U.S.C. § 1413(f) in order to provide CCEIS. 20 U.S.C. § 1418(d)(2). Under 20 U.S.C. § 1413(f)(1), the maximum amount of funds permitted is 15% of the LEA's IDEA Part B funding. Thus, the statute expressly requires the LEA to set aside 15% of the total funds received toward providing CCEIS. 20 U.S.C. § 1413(f)(1); see also 20 U.S.C. § 1418(d)(2)(b) (requiring the State to direct the LEA to reserve funds for the provision of CCEIS to address factors contributing to significant disproportionality); 34 C.F.R. § 300.646(d) (same). As the Commissioner found, this 15% set-aside is mandatory, and she has no discretion. See 20 U.S.C. §§ 1413(f)(1) and 1418(d)(2). Plus, the regulations specifically

state that "[n]othing in this section authorizes a State or an LEA to develop or implement policies, practices, or procedures that result in actions that violate the requirements of this part[.]" 34 C.F.R. § 300.646(f). The Commissioner followed this federal mandate and required that the district reserve $1,442,938 for CCEIS programs at Lakewood's public schools.

Lakewood contends the reservation of these funds for CCEIS would be counter-productive because it would result in a reduction of its special education services budget for public schools by depriving the District of funds that are used "primarily to supplement expensive and much-needed, out-of-district placements[.]" But the IDEA requires, and USDOE guidance has confirmed, the mandatory 15% reservation of total IDEA Part B funds was intended to be drawn from districts' total allocation. Memorandum from William W. Knudsen, Acting Director, Office of Special Education Programs to the Chief State School Officers and State Directors of Special Education ("ceis-guidance.doc" available from https://www2.ed.gov) ("[A]n LEA may not deduct funds for equitable services for students parentally-placed in private schools before calculating the 15%. An LEA that is required to use funds for [CCEIS] because of significant disproportionality must use 15% of the total Part B funds awarded to the LEA.");

see also 20 U.S.C. § 1418(d)(2)(B); 31 U.S.C. § 1413(f)(1); 34 C.F.R. § 300.646(d). DOE retains no discretion in this regard.

Even with the 15% deduction, Lakewood will still retain all its publicly-allocated Part B funds. A portion of that allocation, however, must simply be earmarked for CCEIS. The entire purpose of requiring a 15% reservation of funds for CCEIS is to identify and address factors contributing to significant disproportionality in public schools. See 20 U.S.C. § 1418(d)(2)(B); 34 C.F.R. § 300.646(d)(1)(ii). The regulations mandate that, when significant disproportionality is identified, IDEA Part B funds are earmarked to "identify and address" the types of factors that contribute to significant disproportionality, which could include a "lack of access to scientifically based instruction; economic, cultural, or linguistic barriers to appropriate identification or placement in particular educational settings; inappropriate use of disciplinary removals; lack of access to appropriate diagnostic screenings; differences in academic achievement levels; and policies, practices, or procedures that contribute to the significant disproportionality." 34 C.F.R. § 300.646(d)(1)(ii).

Funds reserved for CCEIS may go to "activities that include professional development and educational and behavioral evaluations, services, and supports." 34 C.F.R. § 300.646(d)(1)(i). The IDEA requires Lakewood to

reserve 15% of its overall IDEA Part B funds, and then draw that amount from its public allocation, in order to address and rectify the root causes for significant disproportionality. Lakewood still has funding for a wide variety of services under 34 C.F.R. § 300.646(d)(1)(i)—the same type of services for which Lakewood would use IDEA Part B funds. The regulation broadly allows for the provision of services spanning across "professional development and educational and behavioral evaluations, services, and supports." Lakewood cannot use those funds for tuition to private schools, which makes sense given that one of the areas for which Lakewood was identified as being significantly disproportionate is the number of White students placed in separate education settings such as private schools.

Because Lakewood has not raised on appeal any challenge to the Commissioner's ruling on its procedural due process claim, that issue is waived and will not be considered by this court. See Telebright Corp., Inc. v. Dir., N.J. Div. of Taxation, 424 N.J. Super. 384, 393 (App. Div. 2012) (issues not raised on appeal are waived).

Any remaining arguments raised by appellants are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-0709-21